WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fabio Evelio Gomez,<br><br>Petitioner,<br><br>v.<br><br>Ryan Thornell, et al.,<br><br>Respondents. | No. CV-21-01529-PHX-MTL<br><br>**ORDER**<br><br><u>DEATH PENALTY CASE</u> |

The Court previously granted Respondents' motion to bar Petitioner Fabio Evelio Gomez from contacting his trial jurors, absent leave of Court based on a showing of good cause. (Doc. 20 at 10.) Gomez now moves for leave, which Respondents oppose. (Docs. 42 and 53.) The Court will deny this motion.

**I.   BACKGROUND**

Gomez is a black, Latino, man originally from the Dominican Republic. *State v. Gomez* (*Gomez I*), 123 P.3d 1131, 1133 (Ariz. 2005). Gomez moved to the United States and into an apartment in Chandler, Arizona, where he lived with his white girlfriend and baby. *Id*.; Doc. 42 at 2; R.T. 2/28/01 at 91. They lived across "the landing" from Joan Morane, a white woman. *Gomez I*, 123 P.3d at 1133–34; Doc. 42 at 2; R.T. 2/28/01 at 91. In early December 1999, Morane was found dead in a nearby dumpster. *Id*. Gomez was charged with kidnapping, sexually assaulting, and murdering Morane.

In February 2001, a panel of prospective jurors was voir dired. The trial court excused prospective jurors who identified themselves, or family members, as victims of

crime and who stated they were unable to impartially serve as a juror in Gomez's case. (R.T. 2/28/01, vol. 1, at 63–64, 77.) The court asked the remaining panel members the following questions:

> 1. "Have any of you or any of your close personal friends or family members ever been discriminated against for any reason such as age, gender, race, religion, or something of that nature or felt they had been discriminated against for those reasons?"
>
> 2. "The defendant in this case is a Spanish-speaking black man from the Dominican Republic. Will the race or heritage of the defen[dant] influence any of you in any way with regard to this case?"
>
> 3. "The evidence may show that the defendant was living with a white woman and had a child with that person. Will this influence you in any way or keep you from being fair and impartial with regard to this case?"
>
> 4. "Do any of you have any feelings one way or another about the defendant's race or heritage or his relationship with the woman described that would keep you from being fair and impartial in this case?"
>
> 5. "Is there anyone who would not be offended by a racial slur or a racial joke?"
>
> 6. "Have any of you or any of your close personal friends or family members ever had a bad experience with someone who was black that you attribute to the person being black?"
>
> 7. "Do any of you believe that black people are treated differently by the criminal justice system than those of other races?"

(*Id*. at 90–91.)

The only question to which some prospective jurors responded, yes, was question 7. (*Id*. at 91–94.) When further questioned by the court, they each denied that Gomez's race would influence them in deciding the case. (*Id*. at 92–94.) Defense counsel did not seek to ask any follow-up questions.

The court then asked the panel members two more questions about race and ethnicity:

> 1. "Do any of you feel that people of a particular race or ethnic

        background, in this case black, are more likely or not to commit violent crimes?" (*Id.* at 94.)

2.     "Have any of you or any of your close personal friends or family members ever belonged to any organization or contributed to any group that advocates a pro white or separation of races position?" (*Id.*)

No one responded affirmatively to these questions. (*Id.*)

The court then asked the jury panel members about:

- the "civic clubs or professional organizations or societies" in which they engaged or served as an officer;
- the "magazines or periodicals" they "regularly subscribe[d] to or read";
- their hobbies and recreational activities; and
- the radio stations to which they listened.

(*Id.* at 97.)

In response, one panel member, who later became the foreperson, responded that he listened to Rush Limbaugh's radio show. (*Id.* at 133, 135.) The court asked him whether there was "any reason" he thought he would be "unable to be fair and impartial" in the case. (*Id.* at 135.) He answered, "no." (*Id.*) Defense counsel did not seek to individually question the panel members or to ask follow up questions. The court granted defense counsel's motion to strike two panel members, and the prosecutor's motion to strike a panel member, for cause; a 12-person jury with three alternates was empaneled. (*Id.* at 146–49; R.O.A. 86 at 2–3.) The available record does not reflect the race or ethnicity of the empaneled jury, or of the excused panel members. But in post-trial filings, Gomez referred to being tried by an all-white jury. (*See, e.g.*, R.O.A. 468 at 5.) Defense counsel did not challenge the racial composition of the jury or assert a *Batson* challenge as to those excused.

At trial, the jury found Gomez guilty as charged. *State v. Gomez* (*Gomez II*), 293 P.3d 495, 497–98 (Ariz. 2012). Before the trial court could sentence Gomez, the United States Supreme Court held Arizona's capital sentencing statutes unconstitutional where

Arizona law required that the court, rather than the jury, find any aggravating circumstance, making a defendant eligible for a death sentence. *See Ring v. Arizona*, 536 U.S. 584, 609 (2002).

In 2003, following revision of Arizona's capital sentencing statutes, Gomez was appointed new counsel and a new jury was empaneled for the purpose of determining whether the death penalty should be imposed. (R.O.A. 239 at 2; R.O.A. 297 at 1.) That jury sentenced Gomez to death for the murder. *Gomez II*, 293 P.3d at 498. On direct appeal, the Arizona Supreme Court reversed the death sentence because the jury may have seen Gomez in shackles.[1] *Gomez I*, 123 P.3d at 1139–42.

In 2010, Gomez was again appointed new counsel. (*See* R.O.A. 750 at 1.) On September 2, 2010, the prosecutor asked the court whether counsel would be allowed to question panel members. (R.T. 9/2/10 at 7.) The court responded they would be allowed to question the panel members, who were going to report back in small groups, following initial questioning by the court. (*Id.*) Before the initial screening by the court, the prosecutor requested the trial court to ask panel members about "the race issue." (R.T. 9/7/10 at 4.)

Before it began questioning panel members, the court informed the panel that Gomez was from the Dominican Republic. (*Id.* at 54–55.) It told the panel members that if they served as jurors, they could not base their verdict on Gomez's race or national origin and asked them whether Gomez's race or national origin would prevent any of them from being fair and impartial. (*Id.* at 55–56.) No panel member responded that it would. (*Id.* at 56.) The court then had the panel members sworn, and they completed a juror questionnaire. (*Id.* at 60–61.)

Over three days, the court questioned panel members, who had been divided into three groups. The court, as well as the parties, asked individual panel members about crimes, including ones involving home invasions or death, that had affected them, their families, or their friends. (R.T. 9/8/10 at 54–55, 72–73; R.T. 9/9/10 at 31–32, 43–44, 64–

---

[1] The Arizona Supreme Court also reversed Gomez's kidnapping sentence and remanded the case for resentencing. *Gomez I*, 123 P.3d at 1142. Gomez was resentenced for kidnapping, which the Arizona Supreme Court affirmed. *Gomez II*, 293 P.3d at 503.

65, 67, 74–75, 77; R.T. 9/13/10 at 38–39.) Of the prospective jurors who disclosed that such crimes had affected them, their family, or their friends, no one indicated that such crimes would prevent them from being fair and impartial, including after questioning by defense counsel and the prosecutor. (R.T. 9/8/10 at 55; R.T. 9/9/10 at 32, 43–44, 69–74; R.T. 9/13/10 at 39–40.) Thereafter, a resentencing jury was empaneled, at least one of whom was black. (R.T. 9/20/10 at 8, 16.)

Following the close of evidence, the court instructed the jury concerning the use of social media:

> During your deliberations you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic devices or media, including telephone, cell phones, smart phones, iPhones, Blackberry or computer, the internet, any internet service or any text or instant messaging service, any internet chat room, blog website, such as Facebook, MySpace, Linkedin, YouTube or Twitter to communicate with anyone any information about this case or to conduct any research about the case until I've accepted your verdict.

(R.T. 9/30/10, vol. 1, at 69.) The resentencing jury found the "especially cruel" aggravating circumstance later that day and sentenced Gomez to death. (R.T. 9/30/10, vol. 2, at 3.) *See Gomez II*, 293 P.3d at 498. On direct appeal, the Arizona Supreme Court affirmed. *Gomez II*, 293 P.3d at 503.

In his initial petition for postconviction relief, Gomez sought discovery of mitigation evidence of his abusive childhood and brain damage. (R.O.A. 941 at 4–7, 45–46.) In his second amended petition, he did not seek discovery. (*See* R.O.A. 966.) "[T]o avoid preclusion" under *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), Gomez cited his conviction by an all-white jury and his belief, without argument, that the "prosecution team" had been prejudiced against him based on his race. (R.O.A. 966 at 10.) The postconviction-review court summarily dismissed Gomez's claims and denied relief, and the Arizona Supreme Court denied review. (R.O.A.s 1003 and 1006; P.F.R. 30; ASC Minute Letter.) Thereafter, Gomez commenced this case. (Doc. 1.)

- 5 -

## II.   DISCOVERY IN HABEAS CORPUS CASES

Habeas petitioners are not entitled to discovery as a matter of course. *Bracy v. Gramley,* 520 U.S. 899, 904 (1997). But "[w]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Harris v. Nelson,* 394 U.S. 286, 300 (1969). Habeas Rule 6(a) codifies this duty and is meant to be "consistent" with *Harris. Bracy,* 520 U.S. at 909; Advisory Committee's Note on Habeas Corpus Rule 6, 28 U.S.C., p. 479. The rule reads: "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Rules Governing § 2254 Cases, Rule 6(a), foll. 28 U.S.C. § 2254.

## III.   CLAIMS FOR WHICH GOMEZ SEEKS TO CONTACT JURORS

In its February 2022 Order, the Court prohibited Gomez from contacting jurors without first obtaining leave of Court. Leave is available on a showing of good cause "that extraneous prejudicial information or outside influence was improperly brought to the jury's attention, or . . . evidence of racial stereotypes or animus affecting a verdict or sentence." (Doc. 20 at 10.)

Gomez seeks leave to contact those summoned as prospective jurors at the guilt- and resentencing-phases of his criminal proceedings to support the following habeas claims:

1. the State relied on "discriminatory" racial or national-origin criteria to strike prospective guilt- and resentencing-phase jurors, which infected those phases with racial or national-origin prejudice (Doc. 51 at 19–38, Claims 2–4);

2. group *voir dire*, absent individual questioning, violated due process and the right to a fair and impartial jury (*id.* at 81–83, Claim 8); and

3. trial counsel rendered ineffective assistance by failing: to ask prospective guilt-phase jurors about possible racial or national-origin biases; to challenge the all-white composition of his guilt phase jury as not drawn from a fair-cross section of the community; and to question prospective resentencing-phase jurors about racial and

national-origin biases (*id*. at 38–52, 98–112, Claims 5 and 13).

### A. Racial and National Origin Criteria to Strike Prospective Jurors

An accused has a Fourteenth Amendment, equal protection right against "[p]urposeful racial discrimination" in selecting his jury. *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019). In *Batson*, the United States Supreme Court required a three-step test to assess claims of such discrimination. 476 U.S. 79, (1986). First, the accused has the burden to make "a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 93–94). If he meets that burden, the burden shifts to the State "to offer "permissible race-neutral justifications for the strikes." *Id*. (quoting *Batson*, 476 U.S. at 94). Last, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam).

The accused also has a Fourteenth Amendment, due process right to a fair trial. *United States v. Agurs*, 427 U.S. 97, 107 (1976); *see also In re Murchison*, 349 U.S. 133, 136 (1955) (noting this "basic requirement of due process"). As part of that right, the accused has a right to "an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010) (citing U.S. Const. amend. VI and XIV); *see also McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 55 (1984) (noting an "impartial trier of fact" is a "touchstone of a fair trial").

### B. Fair and Impartial Jury

"[*V*]*oir dire* can be . . . essential" to guard one's right to an impartial jury. *Wagner v. Shauers*, 135 S. Ct. 521, 528–29 (2014) (citing cases). To that end, a capital defendant "accused of an interracial crime is entitled to have prospective jurors informed" of the victim's race and asked about "racial bias." *Turner v. Murray*, 476 U.S. 28, 36–37 (1986). Such bias can violate an accused's right to a fair trial. *See Peña-Rodriguez v. Colorado*, —

U.S. —, 137 S. Ct. 855, 871 (2017); *see also United States v. Gonzalez*, 214 F.3d 1109, 1111 & 1114 (9th Cir. 2000) (citing *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (noting that "[t]he bias or prejudice of even a single juror" will cause an unfair trial). Three cognizable forms of juror bias have been recognized:

    1.    "actual bias, which stems from a pre-set disposition not to decide an issue impartially," *United States v. Olsen*, 704 F.3d 1172, 1189 (9th Cir. 2013) (internal quotation marks omitted);

    2.    "implied (or presumptive) bias, which may exist in exceptional circumstances, where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury," *id.*; and

    3.    "so-called *McDonough*-style bias, which turns on the truthfulness of a juror's responses on *voir dire*," where an honest "'response would have provided a valid basis for a challenge for cause,'" *Fields v. Brown*, 503 F.3d 755, 766–67 (9th Cir. 2007) (quoting *McDonough Power Equip., Inc.*, 464 U.S. at 554–56).

In terms of actual bias, "[t]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." *Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961). Rather, "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court," that will suffice. *Id.*; *United States v. Olsen*, 704 F.3d 1172, 1191 (9th Cir. 2013) (quoting *Irvin*, 366 U.S. at 722–23); *see also See Peña-Rodriguez*, — U.S. —, 137 S. Ct. at 871 (finding admissible, testimony from jurors that another juror had expressed stereotypical, anti-Hispanic views about the accused and his alibi witness); *Gonzalez*, 214 F.3d at 1111 (holding that "the failure to excuse [a juror] for cause under either an express or implied bias theory requires reversal"); *United States v. Ganias*, 755 F.3d 125, 132 (2d Cir. 2014) (citing cases) ("A juror . . . who posts comments about the trial on Facebook, may, in certain circumstances, threaten a defendant's Sixth Amendment right to an impartial jury," finding that a juror who posted on Facebook, "Jury duty 2morrow. I may get 2 hang someone . . . can't wait," and "friended" another juror on Facebook did not violate that

right because the trial court found the juror's testimony credible that he "deliberated impartially and in good faith."), *on rehearing en banc on other ground in* 824 F.3d 199 (9th Cir. 2016). "The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice." *Dyer v. Calderon*, 151 F.3d 970, 973 n.2 (9th Cir. 1998).

### C.  Fair Cross Section of the Community

The accused must show the following to make a prima facia case that his jury was not selected from a fair cross section of the community: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). "The first showing is, in most cases, easily made; the second and third are more likely to generate controversy." *Berghuis*, 559 U.S. at 319.

### D.  Ineffective Assistance During Jury Selection

Under the Sixth Amendment, a defendant has the right to the effective assistance of trial counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) (citations omitted). To prove counsel's ineffectiveness, petitioner must show that counsel performed deficiently, and that this deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687–88, 691–92 (1984). Counsel performs deficiently when his representation falls "below an objective standard of reasonableness." *Id*. at 687–88. To show unreasonableness, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). To establish prejudice, a petitioner must show "a reasonable probability that, but for counsel's" deficient performance, the trial's outcome would have differed. *Id*. at 694. A reasonable probability must "undermine[s] confidence in the outcome." *Id.*

Gomez contends that defense counsel rendered ineffective assistance by failing to ask prospective guilt-phase jurors about possible racial or national-origin biases; to challenge the all-white composition of his guilt phase jury as not drawn from a fair-cross section of the community; and to question prospective resentencing-phase jurors about racial and national-origin biases. (Doc. 51 at 38–52, 98–112.) Absent evidence of actual juror bias, a petitioner cannot establish prejudice for purposes of an ineffective assistance of counsel claim. *See Denham v. Deeds*, 954 F.2d 1501, 1505 (9th Cir. 1992) (declining to find ineffective assistance based on counsel's failure to object to juror who had met victim where there was no evidence juror could not be impartial); *Quang Minh Tran v. Cate*, No. SA CV 12-1439-SJO (PLA), 2013 WL 3755968, at *8 (C.D. Cal. July 13, 2013) (holding that petitioner did not show prejudice by not revealing any "underlying juror misconduct," finding "post-trial comment about punishment means that the juror failed to deliberate his case impartially[] is too speculative and tenuous to warrant relief").

## IV. Gomez Has Not Shown Good Cause to Contact Prospective or Empaneled Jurors

Gomez claims that the State evoked racial stereotypes and animus at the guilt phase. (Doc. 42 at 2–4.) First, he notes that his case "undeniabl[y]" had "racial dynamics" because he is a black, Latino man, who had a baby with his white girlfriend, and the victim was a white woman. (*Id.* at 2.) Gomez argues that to rebut his defense that he had consensual sex with the victim, the State offered evidence that the victim had opposed interracial dating and sex and that Gomez "grossed" her out. (*Id.* 2–3, citing R.T. 3/5/01 at 144–45; R.T. 3/6/01 at 72–73; R.T. 3/21/01 at 51.) The State also offered evidence that a neighbor, who had never spoken to Gomez, thought Gomez looked "aggressive," which Gomez claims enforced a negative stereotype about Black men. (*Id.*, citing R.T. 3/6/01 at 102–03, 106.)

Gomez also argues that in its closing argument, the State portrayed him, as someone whose girlfriend had "cut him off" from sex, and "as lazy and sex-crazed or sex-starved," reinforcing a stereotype that black "men are animalistic, sexually unrestrained, inherently criminal, and ultimately bent on rape." (*Id.* at 3, quoting Mikah K. Thompson, Bias on

Trial: Toward an Open Discussion of Racial Stereotypes in the Courtroom, 2018 Mich. St. L. Rev. 1243, 1250 (2018), citing N. Jeremi Duru, The Central Park Five, The Scottsboro Boys, and the Myth of the Bestial Black Man, 25 Cardozo L. Rev. 1315, 1320 (2004)). Thus, Gomez claims a "racialized atmosphere" during the guilt phase. He argues that "juror interviews are the only way to ensure" that his juries were not racially or ethnically biased so as to have denied him a fair trial. (Doc. 42 at 3.)

Gomez points to statements during the guilt-phase that could have reinforce racial stereotypes and animus against black men but he fails to point to anything other than speculation that such statements adversely affected the impartiality of the guilt-phase jury or its verdict. For example, he does not cite any statements from the State or witnesses that tied their descriptions of Gomez to his race. Nor does he claim that any juror, or prospective juror, raised any issue of racial bias or animus. *See Peña-Rodriguez*, — U.S. —, 137 S. Ct. at 871. As a result, his claim is speculative. *See Calderon v. United States Dist. Ct. for the N. Dist. of California*, 98 F.3d 1102, 1106 (9th Cir. 1996)) (stating that courts should not allow a petitioner to "use federal discovery for fishing expeditions to investigate mere speculation").

Further, the trial court questioned prospective jurors about whether they had racial or ethnic biases and none acknowledged such biases. The trial court also instructed the jurors to decide the facts solely from the evidence produced in court and not to "be influenced by sympathy or prejudice" nor consider the statements of counsel as "evidence or the law." (R.T. 3/5/01, "trial," at 19–20; R.T. 3/22/01 at 35–36.) The court also instructed jurors to presume Gomez innocent, unless the State adduced evidence to meet its burden of proving Gomez guilty "beyond a reasonable doubt." (R.T. 3/5/01, "trial," at 21; R.T. 3/22/01 at 36–7.) Gomez has cited nothing to rebut the presumption that the jury followed these instructions. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Nor has he alleged that any juror either failed to disclose biases based on race or national origin or lied about their ability to impartially render a verdict based on the evidence. In short, Gomez fails to show good cause to contact his jurors based on alleged racial or ethnic bias or animus.

Gomez also claims that his guilt-phase and resentencing juries were discriminatorily composed, or were not comprised of a fair cross-section of the community, and he seeks leave to contact them to ascertain the race of the jurors. (Doc. 42 at 4–5.) But he does not cite, and the Court has not found, any authority that good cause for discovery is established solely to ascertain the jurors' race or to challenge the prosecution's preliminary strikes. *See* Fed. R. Evid. 606(b)(2) (permitting federal jurors to testify about exposure to "extraneous prejudicial information" and "outside influence," as well as mistakes in "entering the verdict on the verdict form"); *see Peña-Rodriguez*, — U.S. —, 137 S. Ct. at 869 (evidence of a juror's clear statements that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant admissible); *see also Cota v. Ryan*, No. CV-16-03356-PHX-DJH (D. Ariz. Aug. 9, 2017) (Doc. 24 at 4) (holding that "claim of ineffectiveness based on a failure to challenge the State's preliminary strikes" does not "fall under any Rule 606(b) exception"). Because a jury's makeup does not fall within the categories set forth in Rule 606(b)(2) or *Peña-Rodriguez*, Gomez's desire to ascertain the races of jurors is not good cause to contact them.

Besides, Gomez's request to contact jurors to ascertain their races is premature because the parties have not fully briefed his habeas claims asserting that his guilt-phase and resentencing juries were discriminatorily composed. Gomez has not amended his habeas petition, Respondents have not answered it, and Gomez has not replied to the answer. The parties' briefs may resolve such claims on the state-court record alone.

Finally, Gomez claims that defense counsel at both the guilt-phase and at resentencing failed to sufficiently question prospective jurors about their possible biases. (Doc. 42 at 5–8.) To support this claim, he asserts that many of the prospective jurors either were crime victims or had family members who were crime victims. (*Id*. at 6.) He also argues that in light of his all-white, guilt-phase jury, and the racial backdrop of his case, his counsel should have individually questioned each guilt-phase and resentencing juror about possible racial or ethnic biases. (*Id*. at 4–6.)

In the absence of anything in the record that reflects racial or ethnic bias or animus

influenced any juror, Gomez fails to show good cause to contact the jurors. At the guilt-phase, the trial court excused all prospective jurors who had identified themselves, or family members, as a victim of crime who indicated they would be unable to impartially serve as a juror in Gomez's case. (R.T. 2/28/01, vol. 1, at 63–64, 77.) The court also questioned prospective jurors about any possible racial or national-origin biases, and none of indicated they could not serve impartially. (*Id*. at 90–94.) And Gomez fails to point to anything to rebut the presumption that the panel members answered truthfully. *See United States v. Huguenin*, 950 F.2d 23, 30 (1st Cir. 1991) (adopting that presumption); *United States v. Masat*, 896 F.2d 88, 95 (5th Cir. 1990) (same); *United States v. Spine*, 945 F.2d 143, 148 (6th Cir. 1991) (same); *see also Wainwright v. Witt*, 469 U.S. 412, 428 (1985) (explaining that the issue, whether a juror is biased, turns on "determinations of demeanor and credibility that are peculiarly within a trial judge's province").

Gomez, however, claims that the foreperson at the guilt phase identified himself as a listener of Rush Limbaugh's radio show, and cites Limbaugh's proclivities to make racially, ethnically, socially, and politically provocative statements. (Doc. 42 at 6–7, citing articles on Limbaugh's controversial nature; R.T. 2/28/01, vol. 1, at 133, 135.) The court asked him whether there was "any reason" he thought that would render him "unable to be fair and impartial in this case." (R.T. 2/28/01, vol. 1, at 135.) The foreperson answered, no. (*Id*.) Neither party sought additional follow-up. (R.T. 2/28/01, vol. 1, at 133, 135.) And Gomez fails to point to anything to support that the foreperson listened to Limbaugh because of racial bias or animus rather than for other reasons or that listening to Limbaugh prevented the juror from fairly and impartially reaching a verdict based on the evidence. *See Irvin*, 366 U.S. at 722–23; *Lewis*, 325 F.Supp.3d at 335.

Gomez also states that the resentencing jury foreperson posted negative comments on Facebook about fellow venire members and had "liked" several law-enforcement groups, as well as a group supporting Arizona Senate Bill 1070 (S.B. 1070).[2] (Doc. 42 at

---

[2] *See* H.R. 2162, 49th Leg., 2d Reg. Sess. (2010) (noting that the Arizona legislature enacted S.B. 1070 to stop unlawful entry, presence, and economic activity by those "unlawfully present in the United States").

7–8.)[3] This, absent more, does not support that this juror was racially or ethnically biased or an inference that the juror was unable to follow jury instructions or to render a fair and impartial verdict based upon the admissible evidence. *See Irvin*, 366 U.S. at 722–23; *Lewis*, 325 F.Supp.3d at 335. Gomez does not claim that this juror discussed the case or Gomez's race or national origin, or that this juror cited either as reasons for his negative comments about other panel members. Nor does Gomez point to any social media posts that voice racially or ethnically prejudicial opinions. In short, the resentencing juror's Facebook posts, without more, do not establish good cause for Gomez to contact his jurors.

In sum, Gomez has failed to show good cause, at this juncture, to contact jurors. Therefore, the Court will deny Gomez's motion to contact jurors.

Accordingly,

**IT IS ORDERED denying** Gomez's Motion for Leave to Contact State Court Jurors (Doc. 42).[4]

Dated this 24th day of April, 2023.

Michael T. Liburdi
United States District Judge

---

[3] Gomez did not provide this evidence to the Court.

[4] In its Order granting Gomez a third extension of time to amend his habeas petition, the Court noted that the ruling on his motion to contact jurors would include an adjusted briefing schedule. (Doc. 71 at 2.) Because the Court then stayed the briefing in this case (Doc. 77), the Court will not adjust the briefing schedule at this time.

- 14 -